STATE *v.* BOLLER *et al.*

(*Circuit Court, D. New Jersey.* February 15, 1889.)

JUDGMENT—RES JUDICATA.

A judgment of the circuit court of the United States, which dismisses the bill of a state to restrain a railroad company from erecting a bridge across a sound between it and another state on the ground that authority therefor is conferred by an act of congress, is a bar to a subsequent action in ejectment by the same state against the same defendants in the same court with respect to the land occupied by a pier of the said bridge.

At Law. Action in ejectment by the state of New Jersey against Alfred P. Boller, the Staten Island Rapid Transit Railroad Company, and another. Dismissed.

The agreed statement of facts referred to in the order of the court is as follows:

"The parties having stipulated that this case shall be tried without a jury before Mr. Justice BRADLEY as sole judge of the law and facts in the case, the following is now agreed upon as a full statement of the facts upon which the case is to be submitted to the judge for decision:

"(1) The lands described in the summons and declaration are the pieces of land in the bed of Arthur Kill or Staten Island sound west of the middle line of the Sound and east of high-water mark, which are actually occupied by the piers of the railroad bridge recently erected across the Sound from New Jersey to New York by the Staten Island Rapid Transit Railroad Company, one of the defendants.

"(2) That Alfred P. Boller, another of the defendants, was the contractor who at the commencement of the suit was erecting said bridge, and had placed the piers on said pieces of land under the direction of said railroad company, and has no further or other interest in the said lands, and is not now in possession thereof.

"(3) That the said lands are within the territorial limits and jurisdiction of the state of New Jersey as the same was defined by the act entitled 'An act for the settlement of the territorial limits and jurisdiction between the states of New Jersey and New York,' passed February 6, 1833.

"(4) That the said lands are embraced within the boundaries of the province of New Jersey as described in the letters patent of King Charles the second of England to James, duke of York, dated March 12, 1664, recorded in 'Liber Salem 1' of deeds, page 1; in a conveyance by lease and release dated

June 23 and June 24, 1664, by James, duke of York, to Berkeley and Carteret, recorded in Liber C 3, pages 1 and 2; in a partition deed between Sir George Carteret and William Penn and others, dated July 1, 1676, recorded in Liber C 3, page 9, and within the part of New Jersey set off to Sir George Carteret by the last-mentioned deed; in a conveyance by lease and release by the widow and trustees of Sir George Carteret, dated February 1 and February 2, 1682, recorded in Liber A, pages 4 and 6, to William Penn and others; and in a deed of confirmation, dated March 16, 1683, from James, duke of York, to the earl of Perth and others, twenty-four in number, known as the 'Proprietors of East New Jersey,' recorded in Liber A, page 53,—all of which papers or copies thereof are to be regarded as exhibits in this suit so far as either party may require.

"(5) That the said proprietors, or their assigns, by an instrument dated April 15, 1702, surrendered and yielded up to the then queen of Great Britain and Ireland, her heirs and successors, the power and authority to correct, punish, pardon, govern, and rule all or any of her majesty's subjects, or others who then inhabited or thereafter should adventure into or inhabit within the said provinces of East Jersey and West Jersey, or either of them, and also to nominate, make, constitute, ordain, and confirm any laws, orders, ordinances, and directions and instruments for those purposes, or any of them; and to nominate, constitute, or appoint, revoke, discharge, change, or alter any governor or governors, officers or ministers, which are or shall be appointed, made, or used within the said provinces, or either of them; and to make, ordain, and establish any orders, laws, directions, instruments, forms, or ceremonies of government and magistracy, for or concerning the government of the provinces aforesaid, or either of them; or on the sea in going or coming to or from thence; or to put in execution, or abrogate, revoke, or change such as are already made for or concerning such government, or any of them; and also all those the said powers and authorities to use and exercise martial law in the places aforesaid, or either of them, and to admit any person or persons to trade or traffic there; and of encountering, repelling, and resisting by force of arms any person or persons attempting to inhabit there without the license of the said proprietors, their heirs or assigns; and all other the powers, authorities, and privileges of or concerning the government of the provinces aforesaid, or either of them, or the inhabitants thereof, which were granted or mentioned to be granted by the letters patent from King Charles second to James, duke of York, and every of them.

"(6) That, pursuant to the foregoing instrument of surrender, Anne, queen of Great Britain and Ireland, in 1702 assumed, and she and her successors thenceforward exercised, all governmental powers, rights, and privileges in and over the province or colony of New Jersey, and entered into the possession of and enjoyed all the *jura regalia* within the boundaries of said province or colony, and she and her successors wearing the crown of Great Britain and Ireland continued to possess and enjoy the same until the 2d day of July, A. D. 1776, at which date the people of the colony of New Jersey, by their representatives duly convened, assembled in provincial congress, assumed all powers of government in said province or colony, and entered into possession of all *jura regalia* within the bounds of said province or colony, and possessed, exercised, and enjoyed the same by right of conquest; and by the constitution of the said colony or province adopted July 2, 1776, vested the said governmental powers and *jura regalia* in the state of New Jersey, which said state entered into the possession, exercise, and enjoyment of the same, and has ever since exercised, possessed, and enjoyed, and now exercises, possesses, and enjoys, the same; subject, however, to such limitations and modifications, if any there be, as arose by law out of the adoption of the federal constitution by the state of New Jersey in 1787, and from its posi-

tion and obligations as one of the United States of America, and a member of the Federal Union.

"(7) That the state of New Jersey has not ceded, granted, or conveyed the *locus in quo,* or granted any easement or title therein or thereto, to the United States of America, or to any person or persons other than such as arose by law out of the adoption of the federal constitution by said state; and that the state has regulated the use, possession, and alienation of the shore and bed of the tidal waters within its territorial boundaries by the following statutes, to-wit: ' An act for the preservation of clams and oysters, passed June 9, 1820,' (Revision 1821, p. 757;) 'a supplement to said act, passed December 8, 1823.' (Har. Comp. p. 46;) 'a further supplement to said act, passed December 10, 1825,' (Har. Comp. p. 124;) ' a further supplement to said act, passed December 26, 1826,' (Har. Comp. p. 143;) ' An act for the preservation of clams and oysters, Revision, 135, approved April 14, 1846,' (Nix. Dig. p. 130;) 'a supplement to said act approved March 19, 1851,' (Nix. Dig. p. 134;) 'a further supplement to said act, approved March 18, 1852,' (Nix. Dig. p. 134;) 'a further supplement to said act, approved February 22, 1853,' (Nix. Dig. p. 134;) 'a further supplement to said act, approved March 9, 1855,' (Nix. Dig. p. 134;) ' a further supplement to said act, approved March 31, 1864,' (Nix. Dig. p. 134;) 'a further supplement to said act, approved March 14, 1871, (Revision 1877, p. 139;) ' a further supplement to said act, approved March 12, 1873,' (Revision 1877, p. 140;) ' An act for the better enforcement in Maurice River cove and Delaware bay of the act entitled "An act for the preservation of clams and oysters," approved April 14, 1846, and the supplements thereto, approved March 21, 1871,' (Revision 1877, p. 140;) ' a supplement to said act, approved February 27, 1873,' (Revision 1877, p. 142;) ' a further supplement to said act, approved February 18, 1875,' (Revision 1877, p. 144;) 'further supplements, approved, respectively, February 27, 1877, March 10, 1880, March 8, 1882, March 17, 1882, March 31, 1882, March 2, 1883, February 20, 1886, March 22, 1886, April 27, 1886, and May 11, 1886,' (Revision 1886, p. 114–123;) ' An act to authorize the owners of lands upon tide-waters to build wharves in front of the same, approved March 18, 1851,' (Nix. Dig. p. 1025;) 'supplement thereto, March 10, 1853,' (Nix. Dig. p. 1027;) ' An act to ascertain the rights of the state and the riparian owners in the lands lying under the waters of the bay of New York and elsewhere in the state, approved April 11, 1864,' (Revision 1877, p. 980;) supplements to said act, respectively approved March 31, 1869, March 21, 1871, April 4, 1872, March 27, 1874, April 5, 1875, March 9, 1877; ' a joint resolution, approved March 17, 1870; ' An act relative to the riparian commission, approved April 6, 1871,' (Revision 1877, pp. 982–988;) all of which and the volumes of the statutes referred to are to be regarded as exhibits in this suit so far as either party may require. Under and pursuant to said acts, the state of New Jersey has made numerous grants and leases of land under its tidal waters, including lands under the waters of the Arthur Kill von Kull, and Staten Island sound, to private citizens and corporations of said state, prior to June 16, 1886. The number of such grants prior to June 6, 1886, was 411, and the purchase money paid to the state for the lands so granted was $1,895,696.31. The number of such leases was 127, and the annual rents thereby reserved was $77,358.24.

"(8) That Arthur Kill, in the bed of which the said lands are situate, is a navigable stream flowing between the states of New Jersey and New York, connecting Raritan bay with Kill von Kull and the bay and harbor of New York; and the middle of said stream is the boundary line between said states.

"(9) On the 16th day of June, 1886, the congress of the United States passed an act, which was approved by the president. See St. at Large, 49th Cong. pp. 78, 79.

v.47 F.no.6—27

"(10) In pursuance of the said act of congress, the Staten Island Rapid Transit Railroad Company, desiring to avail itself of the power given by said act to construct a railroad bridge over the Staten Island sound, submitted its plan and location of such bridge, with a detailed map of the Sound at the proposed site thereof, to the secretary of war, and requested his approval thereof, as required by said act; and thereupon, on the 26th day of March, 1887, the secretary of war duly gave to the said railroad company his approval of such plan and location, which was also executed and accepted by the Staten Island Rapid Transit Railroad Company, of which approval and acceptance the following is a copy:

"'Whereas, by an act of congress, entitled "An act to authorize the construction of a bridge across the Staten Island sound, known as 'Arthur Kill,' and to establish the same as a post road," it was enacted that it shall be lawful for the Staten Island Rapid Transit Railroad Company, a corporation existing under the laws of the state of New York, and the Baltimore and New York Railroad Company, a corporation existing under the laws of the state of New York, or either of said companies, to build and maintain a bridge across the Staten Island sound or Arthur Kill, from New Jersey to Richmond county, New York, for the passage of railroad trains, engines, and cars thereon, and to lay on and over said bridge railway tracks for the more perfect connection of any railroads that are or shall be constructed to the said Sound at or opposite to said point,—approved June 16, 1886; and whereas, by section four of the act of congress aforesaid, it was further enacted that the plan and location of said bridge, with a detailed map of the Sound at the proposed site of the bridge and near thereto, exhibiting the depths and currents, shall be submitted to the secretary of war for his approval, and until he approves the plan and location of said bridge it shall not be built; and whereas, the Staten Island Rapid Transit Railroad Company has submitted to the secretary of war for his approval its plan and location of said bridge, and a detailed map of the Sound at the proposed site of the bridge and near thereto, exhibiting the depths and currents as required by the act of congress aforesaid: Now, therefore, I, William C. Endicott, secretary of war, having examined the plan and location of said bridge and detailed map of the Sound, submitted by the Staten Island Rapid Transit Railroad Company as aforesaid, and which are hereto annexed, do hereby approve the same. But it is understood and agreed that this approval is given upon the express conditions following, to-wit: (1) That the said bridge shall be erected at the point indicated in the plan and location submitted; (2) that, should any change be made in the plan of said bridge during the progress of the work thereon, such change shall be subject to the approval of the secretary of war; (3) that, if the secretary of war shall at any time deem any change or alteration necessary in the said bridge, so that the same shall not obstruct navigation, the change or alteration so required shall be made at the expense of the parties owning said bridge; (4) that, if the secretary of war shall think the removal of said bridge necessary, such removal shall be made at the expense of the parties owning said bridge. Witness my hand, this twenty-sixth day of March, 1887.

[Seal.]                    "'WM. C. ENDICOTT, Secretary of War.'

"'This instrument is also executed by the Staten Island Rapid Transit Railroad Company, by J. Frank Emmons, thereto lawfully authorized, in testimony of its acceptance of the conditions herein imposed.

"'THE STATEN ISLAND RAPID TRANSIT R. R. CO.
"'By J. FRANK EMMONS, President,

"'In presence of
    "'FREDERICK S. BROWN.
    "'E. P. GOODWIN.
"'Attest: WM. KEUTGEN.'

"(11) The lands described in the declaration are the same or a part of the lands in the bed of the Sound designated and approved by the secretary of war as the lands to be occupied and used for the piers of said bridge and the supports of the same and the draw thereof, and have been occupied and are now used by the said railroad company for the purpose of such piers and supports and in connection with the construction and use of such bridge, and for no other purpose.

"(12) That James L. Hays, the other defendant, at the time of being admitted to defend this suit was seised in fee of the lands on the west side of Staten Island sound, on which the west pier of said bridge was built, and in front of which, in the bed of the stream, beyond low-water mark, are the parcels of land described in the declaration; and held the same for the use of the Staten Island Rapid Transit Railroad Company.

"(13) That before the construction of such bridge, but after the said plans were approved, and the parcels of land described in the declaration were designated as the parcels to be used and occupied for such piers and supports, the plaintiff, the state of New Jersey, on the 27th day of June, eighteen hundred and eighty-seven, filed an information in the court of chancery of New Jersey against the Staten Island Rapid Transit Railroad Company and Alfred P. Boller, two of the defendants herein, and others, to restrain them from taking and keeping possession of the same tracts of land, which suit was duly removed to this court, and resulted in a final decree in favor of the said defendant, the Staten Island Rapid Transit Railroad Company, adjudging that the said defendant had full right to take possession of the said lands under the said act of congress and the action of the secretary of war thereon, and dismissed the said suit of the plaintiff to prevent the occupation of the said lands by the said defendants, as by reference to the record of the said suit and the opinion of the court therein will fully appear, which record and opinion are hereby made a part of this statement of facts."

*John P. Stockton, Barker Gummere,* and *W. S. Gummere,* for the State.
*A. Q. Keasbey* and *W. W. MacFarland,* for defendants.

BRADLEY, Justice, directed the following order to be entered: This cause came on to be tried before JOSEPH P. BRADLEY, circuit justice for the third circuit, at his chambers in the city of Washington, under and in pursuance of the stipulation hereto annexed, bearing date the 25th day of September, 1888, and upon the agreed statement of facts made and presented by the parties, also hereto annexed, and was argued by Barker Gummere, Esq., counsel for the state of New Jersey, and by W. W. MacFarland and A. Q. Keasbey, Esq., counsel for the defendants. Thereupon, after hearing the arguments of counsel, the court doth adopt as the finding of facts in the case the said agreed statement of the parties; and as a conclusion of law from said facts the court doth find that the right of possession to the lands described in the declaration, as between the state of New Jersey and the defendants, was adjudicated and determined against said state by this court in and by its decree made on the 1st day of August, 1887, in the case of John P. Stockton, attorney general of the state of New Jersey, against the Baltimore & New York Railroad Company, the said the Staten Island Rapid Transit Railroad Company, Charles Ackenheil, Alexander McGaw, and the said Alfred P. Boller, (32 Fed. Rep. 9;) and that said decree is conclusive upon the rights of the parties in the present case; and therefore that the defend-

ants are not, nor is either of them, guilty of the trespasses or injuries complained of in the declaration; and that the plaintiff is not entitled to the possession of the land and premises aforesaid. Wherefore it is considered that the plaintiff take nothing by its action, and that the defendants go thereof without day.